[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Atty. Sonia Stoloff, AAG Atty. Marsha Matthews Atty. Frederic Brody
MEMORANDUM OF DECISION
The instant matter is before the court as a result of a petition for termination of parental rights filed by the Commissioner (hereinafter the Commissioner) of the Department of Children and Youth Services (hereinafter DCYS) pursuant to section 17-43a and 45-61f of the Connecticut General Statutes (re-codified as 17a-112
and 45a-717). DCYS requests the termination of the parental rights of Trenee J., the mother of Kenneth J. born March 19, 1988. The grounds set forth for termination are abandonment, failure to achieve CT Page 2359 personal rehabilitation, the parent's denial by acts of commission or omission of care, guidance or control of the child, and the absence of an ongoing parent-child relationship, all of which factors existed for at least one year. (Section 45a-717 (b)(1), (2), (3))
DCYS filed a petition for termination of Ms. J.'s parental rights dated October 11, 1990. The court finds that the petition was timely filed in that the grounds for termination existed over an extended period of time, not less than one year.
A hearing was set down for November 15, 1990. On that day the court, Cocco, J, continued the matter to December 20, 1990 at 12:30 p. m. and ordered notice given to the mother by publication.
On December 20, 1990 the mother appeared with counsel and was advised of her rights. She denied the allegations. She gave her address as "in care of Albert Hargrove, 158 Selleck Street, Stamford, Connecticut." A trial was scheduled for February 7, 1991 at 2:00 p. m., and the court ordered that the mother be subpoenaed for that date. On February 7, 1991 the mother did not appear, although her counsel did. A "sister" telephoned the court and informed the court that the mother could not attend. She gave the mother's new address as 19 Indian Lane. The court, Leheny, J., ordered that the trial be scheduled to begin on February 21, 1991 at 2:00 p. m., that the mother be subpoenaed and that notice by publication also be effectuated.
On February 21, 1991 the mother failed to appear. Her counsel had been unable to make contact with her.
The court found that return of service had been made by the sheriff on February 19, 1991 at the Selleck Street address, although there was no indication as to whether the service was in hand or by leaving at the usual place of abode. There was no return of service on the subpoena to the Indian Lane address. However, the court found service by publication in the Stamford Advocate on Tuesday, February 12, 1991 and proceeded with the trial.
The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17a-112(b), formerly Section 17-43a(b) of the Connecticut General Statutes; In re Juvenile Appeal (84-AB),194 Conn. 254, 269; In re Theresa S. 196 Conn. 18, 24 n. 5; In re Juvenile Appeal (83-BC), 189 Conn. 66, 72; In re Juvenile Appeal (84-6) 2 Conn. App. 705, 708, cert. denied, 195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 754, 747-48. Clear and convincing evidence has been described as a level of persuasion that lies between the usual civil requirement of proof by a fair preponderance of the evidence and the criminal standard of proof beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is CT Page 2360 sufficient to convince the court beyond an average certainty that the respondent's rights as a parent should be ended. In re Juvenile Appeal (84-3) 1 Conn. App. 463, 468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal,1 Conn. App. 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the abjudicatory phase and the dispositional phase. Conn. Practice Bk. Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition, in this case, October 11, 1990. The dispositional phase takes into account the best interests of the child, and the court is permitted to take into consideration events which had occurred after the filing of the petition to determine the best interests of the child.
DCYS alleges that the child, Kenneth, has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. (Section 17a-112 (b)(1)) "Trenee J. has not seen her son, Kenneth J., since August 18, 1988. Ms. J. has not contacted DCYS since that time about this child. Ms. J.'s whereabouts are unknown to DCYS."
Abandonment focuses on the parent's conduct, and it is a question of fact for the trial court. In re Rayna M., 13 Conn. App. 23; In re Juvenile Appeal, 183 Conn. 11, 14. "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child," as referred to in the statute. In re Shavoughn K., 13 Conn. App. 91, 97, cert. denied 207 Conn. 805; In re Migdalia M., 6 Conn. App. 194, 208-09. "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." In re Shavoughn K., supra, 97; In re Migdalia M., supra, 209; In re Juvenile Appeal183 Conn. 11.
"`The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligation toward his or her children go further than a minimal interest. . . The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and CT Page 2361 affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance . . . .'" In re Rayna M., supra.
DCYS received a referral concerning Kenneth from Stamford Hospital claiming that he tested positive for both cocaine and syphilis at birth on March 19, 1988. When DCYS received the referral from Stamford Hospital, Maxine McIntyre, the intake social worker, testified that she visited Trenee J. in the hospital and at her mother's home on March 23, 1988 and March 24, 1988. Trenee J. admitted that she had used drugs for a period of time. They discussed Trenee's entering a drug treatment program and her residing with her mother, who could provide care for Kenneth in the evenings when Trenee attended the drug program, thereby allowing Trenee to care for the child during the day. Trenee's mother, already raising an older child of Trenee's, refused to be the primary caretaker for Kenneth.
Trenee J. signed a Social Service Agreement with DCYS on March 24, 1988, and DCYS arranged for an evening drug program and advised Stamford Hospital to release Kenneth to his mother. Ms. McIntyre took Trenee to the drug program on April 4, 1988, and Trenee underwent a medical examination on April 6, 1988. On April 6 Trenee signed a Service Agreement in which she agreed that she would enter and complete the Norwalk Hospital drug treatment program, maintain medical appointments scheduled for Kenneth and cooperate with DCYS. Ms. McIntyre testified that she turned the file over to the treatment social worker, Diane Hyatt, and, that at the time she did, Trenee was cooperating.
Diane Hyatt testified that on April 8, 1988 she received a referral from a pediatric nurse who was concerned that Kenneth had tested positive for syphilis at birth and who stated that Trenee had missed medical appointments scheduled for Kenneth. Ms. Hyatt sought to verify this information with the Visiting Nurse Association, also. On May 15, 1988 she learned that Trenee had failed to keep appointments with the visiting nurse assigned to her and that the visiting nurse had been unable on several occasions to reach the mother or child. In addition, the court file contains Ms. Hyatt's Summary of Facts to Substantiate Allegations of Neglect, dated June 3, 1988. In that summary Ms. Hyatt reported that on June 3, 1988 DCYS had received a call from Alice W., Trenee J.'s mother, in which Alice W. informed DCYS that on June 1, 1988 Kenneth had been left by his mother at the home of the paternal grandparents of Trenee's older child, John. These persons were unwilling to care for Kenneth. Ms. W. also stated that Trenee had left the baby with other caretakers on Tuesday and Thursday of each week. Ms. W. further indicated that she did not know Trenee's whereabouts, that she was CT Page 2362 unwilling and unable to care for Kenneth and that he should be placed in a foster home.
On June 3, 1988 the Commissioner filed a petition for an order of temporary custody (hereinafter OTC). The petition alleged that Kenneth, age two months, was a neglected child in that he was abandoned, uncared-for in that he was homeless, and further that he was being denied proper care and attention physically and emotionally and being permitted to live under conditions, circumstances or associations injurious to his well-being; and that the child was born positive for cocaine and syphilis.
The hearing on the petition was scheduled for June 6, 1988. Service of notice of the hearing was made by abode service upon the mother on June 6, 1988. The sheriff was unable to serve the putative father, Leo Kendall.
Ms. Hyatt testified that before the OTC hearing on June 8, 1988, Trenee called and stated that she was being held in Niantic on bond. The OTC was granted and the case continued to June 29, 1988, with service of notice by publication ordered for Leo Kendall. On that date Trenee admitted the allegations. Meanwhile, a Habeus was ordered for Leo Kendall, then incarcerated in Cheshire, and the OTC continued in effect. On July 18, 1988 the putative father denied paternity under oath; the petition was amended to omit his name, and the child was committed to the custody of the Commissioner for eighteen months.
DCYS scheduled a treatment plan review in Niantic, but Trenee was released beforehand. Thereafter, Ms. Hyatt arranged for a visit between Trenee and Kenneth at his foster home on August 18, 1988. Ms. Hyatt, who provided transportation, testified that Trenee's behavior was appropriate. Ms. Hyatt made arrangements with the foster mother for Trenee to visit with Kenneth on her own and to have telephone contact with Kenneth. On the return trip Trenee said that she was interested in returning to school, in remaining drug-free as she had made an appointment with Renaissance and in reuniting with her son. They discussed the reasons why Trenee had not contacted Ms. Hyatt when she was first released from Niantic. Trenee claimed that she had not received the telephone message left by DCYS and had moved, so that she had not received any letters. Shortly after this trip, Ms. Hyatt left the agency. The file was transferred to Judith Kallen, a supervisor who took over the case from September, 1988 to December, 1988. She had no contact with Trenee during this period and had no information regarding her whereabouts. In December, 1988 Ms. Kallen transferred the case to Ann Steers, another staff member. Ms. Steers testified that she had sent letters introducing herself as the new caseworker to both Trenee and the foster mother. The foster mother called and indicated that the child was doing well but that Trenee had not CT Page 2363 contacted her. Ms. Steers arranged to visit Kenneth on March 20, 1989. Ms. Steers found Kenneth to be "engaging" and "lovable". He had received no telephone call, birthday card or visit from his mother acknowledging his first birthday the day before.
Subsequently Ms. Steers received information about the mother. On April 19, 1989 she was told that Trenee had given birth to another child who tested positive for cocaine. Ms. Steers went to the hospital and spoke with Trenee, who admitted using drugs. She had no plans for assuming responsibility for Kenneth but said that she wanted to get herself together for her new son, Michael. When asked why she had not contacted DCYS since August 18, 1988, she said, "Things came up. " Ms. Steers testified that Trenee did not ask about Kenneth. Ms. Steers asked Trenee about her plans for caring for the newborn Michael, and Trenee indicated that her mother would care for him. Ms. Steers checked on this herself, and Ms. W. said that she would not care for Michael.
On April 21 Ms. Steers met with Trenee again regarding Michael. On April 25 Ms. Steers met with Trenee at the home of Glenna Skates at 519 South Pacific Street. Trenee claimed she was there because Ms. Skates was a friend helping her to establish herself and provide a home for Michael. However, Trenee had no crib for Michael or bed for herself, and she had withheld from Ms. Skates the fact that Kenneth was in foster care. Ms. Skates struck Ms. Steers as willing to be supportive, although she was not fully aware of Trenee's history. Meanwhile, she stated that she wished to be licensed as a foster home and sought information to that effect. She did not pursue this expressed intention, however.
Subsequently DCYS filed an Order for Temporary Custody regarding Michael and filed a co-terminus petition which was granted on June 1, 1989. Michael was placed in the same foster home as Kenneth, who was then one year old. After April 25, 1989 DCYS had no further contact with Trenee regarding either child. It did send Trenee notices of treatment plan reviews and copies of treatment plan reviews. She was sent mail at the last known addresses available: 17 Vassar Avenue and 519 South Pacific Street. No mail was returned undelivered by the post office, and no contact came from Trenee.
The case was then transferred to treatment worker Jacqueline Adams in July, 1989. She sent a letter to Trenee introducing herself but received no response. She visited Kenneth who, she testified, was doing "pretty well", although his body was "stiff" and he had speech problems for which he was being assessed for therapy. There had been no visitation or contact by Trenee. Ms. Adams further testified that Kenneth called his foster parents "Mommy" and "Daddy" and had a "loving" and "warm" relationship with his brother; the two functioned as members of a family. CT Page 2364
Ms. Adams sent notice of the development of a treatment plan in November, 1989 to Trenee at 519 South Pacific Street. The mother did not attend or contact DCYS. The letter was not returned as undeliverable. There was no further contact between the agency and Trenee in 1989. In early 1990 Kenneth underwent surgery for an umbilical hernia. No evidence was offered that the condition was related to the presence of cocaine or syphilis in Kenneth at birth.
The mother failed to respond to notice of a treatment plan and failed to acknowledge the child's second birthday in early 1990. DCYS filed a petition for extension of commitment on February 22, 1990.
A hearing was scheduled for June 20, 1990. The mother did not appear, but the court found notice by publication. The commitment was extended to July 13, 1991, retroactive to January 13, 1990. The petition for Termination was filed and dated October 11, 1990. Trenee's address was unknown. Notice by publication was attempted for the November 15, 1990 hearing date. The notice was ordered republished and appeared in the Stamford Advocate on November 20, 1990 for the new hearing date of December 20, 1990. On November 26, 1990 Trenee left a telephone message for Ms. Adams. On November 27, 1990, Ms. Adams spoke with Trenee, her first contact with the mother. Trenee had seen the notice in the newspaper. Ms. Adams obtained her address as in care of Albert Hargrove 158 Selleck Street. Ms, Adams testified that Trenee did not mention Kenneth and asked Ms. Adams what she wanted. When the social worker explained that a termination petition had been filed, Trenee did not respond.
On December 20, 1990, Ms. Adams met Trenee for the first time in court. The mother did not ask about Kenneth. Meanwhile, new counsel was appointed for Trenee and the hearing on Termination rescheduled to February 7, 1991 at 2:00 p. m. After December 20, 1990 Ms. Adams never spoke with Trenee again.
The evidence of abandonment is so clear and convincing and so overwhelming that the court finds it unnecessary to make a determination with respect to the other grounds alleged, as it would be nothing more than an exercise in judicial inefficiency. Trenee abandoned Kenneth in the sense that she failed to maintain or, more basically, develop a reasonable degree of interest, concern or responsibility as to his welfare.
A finding that a statutory ground for termination has been established does not automatically require the termination of parental rights; there must also be proof by clear and convincing evidence that such termination is in the best interest of the child. Since complete severance by court order of the legal relationship, CT Page 2365 with all its rights and responsibilities, between the child and a parent is a most serious and sensitive judicial action, the natural rights of parents and their children are to be given deference and, absent a powerful countervailing interest, protection. In re Juvenile Appeal (84-6), supra, 707; In re Juvenile Appeal (Anonymous),181 Conn. 638, 640. In order to determine if the termination of parental rights is in the best interest of the child under this statute, the court is required to consider and make written findings on the six factors in Sec. 17-112(d), formerly Sec. 17-43a(d), In re Christine F.6 Conn. App. 360.
Based on the preceding information, some of which is part of the Court's file prior to the adjudication of Neglect and the remainder a result of testimony at the termination hearing, the Court finds that DCYS offered and provided timely and extensive services to the parent and child to facilitate their reunion. It arranged for Kenneth to be released to his mother's care upon release from the hospital and arranged for Trenee to have the services of the Visiting Nurse and to attend Norwalk Hospital's drug treatment program. The agency provided transportation to the first appointment at Norwalk Hospital. It developed service agreements with Trenee when she was released from Niantic. DCYS provided transportation to her first and only visit with her son and arranged for her to visit as she chose and to have telephone contact with the foster home. It sent her notices regarding the treatment plan reviews. She did not respond nor did she keep the agency informed of her whereabouts. She did not ask about Kenneth and, in fact, did not include him in her plans after she gave birth to Michael.
Connecticut General Statutes Sec. 17a-112(d)(2) requires consideration of any applicable court order or agreement entered into between an agency and the parent, and the extent to which all parties have fulfilled their obligations thereunder. Since the mother attended the temporary custody hearing but did attend the neglect hearing, orders were not entered affecting her.
Under subsection (d)(3) of the statute, consideration is to be given to the feelings and emotional ties of the child to its parent and any guardian of its person, and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties, and, under subsection (d)(4), the age of the child. Kenneth is now nearly three years old. He has been in foster care since he was three months old. He has lived with the same foster parents since he was placed in DCYS' custody, and he recognizes them as his parents, calling them "Mommy" and "Daddy". The family atmosphere is warm and loving and there is the added bonus for Kenneth of having a sibling in the same home. Ms. Adams testified that there is a parent-child relationship between Kenneth and his foster parents. They are the only parents he has known and the only family unit to CT Page 2366 which he has belonged. In fact, the foster parents are seeking to adopt both Michael and Kenneth.
Connecticut General Statutes Sec. 17a-112(d)(5) requires the court to consider "the efforts the parent has made to adjust . . . [her] circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child."
The parent has made the barest minimum effort to adjust her circumstances, conduct or conditions to make it in the best interest of the child to have him returned to her. She went to Norwalk Hospital once in anticipation of entering its drug program; she saw Kenneth once in the more than two years he has been in foster care. Despite the fact that DCYS provided open and unsupervised visitation in the foster home and arranged for telephone contact, Trenee availed herself of none of these opportunities. She maintained no contact with the child, the social worker or the foster parents.
Connecticut General Statutes Sec. 17a-112(d)(6) requires the court to consider "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstances of the parent." The conduct of no one, neither the foster parents nor social workers, nor visiting nurses nor other parent was unreasonable nor prevented Trenee from developing, let alone maintaining, a meaningful relationship with the child. She was prevented by no hand but her own. There was no evidence her economic circumstances prevented her from maintaining a relationship with Kenneth.
For all these reasons the Court also finds in Kenneth's best interests that Trenee's parental rights in him be terminated. Accordingly, the petition to terminate the parental rights of Trenee J. to her child is granted. The court appoints DCYS as the statutory parent of Kenneth.
Judgment may enter accordingly.
LEHENY, J.